FAUST CORPORATION v. HARRIS



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:FAUST CORPORATION v. HARRIS

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 FAUST CORPORATION v. HARRIS
2020 OK CIV APP 20
Case Number: 117037
Decided: 12/17/2019
Mandate Issued: 06/17/2020
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2020 OK CIV APP 20, __ P.3d __

 

FAUST CORPORATION, Plaintiff/Appellee/Counter-Appellant,
v.
MYKAL ROYETTA HARRIS a/k/a ROYETTA M. HARRIS, Defendant/Appellant/Counter-Appellee,
and
JOHN LOWE and ELIZA LOWE, MIDLAND CREDIT MANAGEMENT, INC., and STATE OF OKLAHOMA ex rel. OKLAHOMA TAX COMMISSION, Defendants,
and
LINDA HOLTZCLAW, as Special Administrator of the ESTATE OF MARY E. WENSAUER, Intervenor/Appellant/Counter-Appellee.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE RICHARD OGDEN, TRIAL JUDGE

AFFIRMED IN PART, AND REVERSED IN PART AND REMANDED WITH DIRECTIONS

Stephen L. Bruce, Everette C. Altdoerffer, Edmond, Oklahoma and
Sharon T. Thomas, Kristin D. Meloni, THE RUDNICKI FIRM, Oklahoma City, Oklahoma, for Plaintiff/Appellee

Gerard F. Pignato, RYAN WHALEY COLDIRON JANTZEN PETERS & WEBBER, PLLC, Oklahoma City, Oklahoma, for Defendant/Appellant Mykal Royetta Harris and Intervenor/Appellant Linda Holtzclaw as Special Administrator of the Estate of Mary E. Wensauer

JANE P. WISEMAN, VICE-CHIEF JUDGE:

¶1 Mykal Royetta Harris and Linda Holtzclaw, Special Administrator of the Estate of Mary E. Wensauer,[1] appeal a trial court order finding that each owned a one-half interest in the property at issue. Faust Corporation counter-appeals asserting its judgment lien against Harris attached to the whole property, not just an undivided one-half interest. After review, we conclude Harris had no remaining interest in the property when Faust's judgment lien was filed in Oklahoma County and Harris therefore had no interest to which the lien could attach. We affirm the trial court's judgment in part and reverse in part and remand with directions.

FACTS AND PROCEDURAL BACKGROUND

¶2 Faust Corporation filed its petition on September 25, 2008, to foreclose a judgment lien on property it alleged was owned by Harris. Faust described the property as Lots 17, 18, 19, and 20, of Block A in the Crestwood Addition, Oklahoma City, Oklahoma (the Property). On October 31, 2008, Mary E. Wensauer filed a motion to intervene stating she owned the Property on which Faust claimed a lien.

¶3 Faust filed a motion for summary judgment asserting the following: It was granted judgment in Pottawatomie County for $11,712.62 and obtained a lien on the Property. It alleged Harris filed a bankruptcy petition and received a discharge in 2003, but "[t]he bankruptcy court did not order [Faust's] judgment lien avoided." Faust renewed its judgment in 2007 and filed a certified copy in Oklahoma County. Faust claimed that although served with summons and petition, Harris failed to appear and was in default and that Mary Wensauer claimed some right, title, or interest in the Property through two unfiled deeds which Harris allegedly executed in 1988.

¶4 In her response to the summary judgment motion, Mary asserted she owned the Property, not Harris, and further that Harris had not included it in her bankruptcy estate because she did not own the Property.

¶5 On September 28, 2010, a judgment in favor of Faust was filed. Mary, the trial court found, "has no right, title, interest, estate, lien or equity of redemption in and to the real property and premises or any part thereof." The court held that Faust was entitled to foreclose its judgment lien, ordered the lien foreclosed, and authorized the issuance of a special execution and order of sale of the Property to satisfy the lien.

¶6 After the trial court denied Mary's motion for new trial, she filed a petition in error with the Supreme Court. When a sheriff's sale was held, the purchaser at the sale asked the trial court to set aside the sale and refund the amount he paid for the Property due to clouds on the title that had not been foreclosed. Because the purchaser asked to cancel his bid, the bid of the next highest bidder (Faust) was accepted. The order confirming sheriff's sale was filed on June 24, 2011.

¶7 In a previous appeal, Case No. 109,056, the Court of Civil Appeals reversed the trial court's summary judgment in Faust's favor. The Court concluded:

[A] question of material fact exists regarding what interest, if any, Wensauer and/or PMSI holds in the Property and when they acquired it. Any interest of Wensauer and/or PMSI acquired prior to the 2002 filing of Faust's Statement of Judgment cannot be disturbed by Faust's judgment lien. Pursuant to 12 O.S. §706, the lien only affects property of the judgment debtor Harris.

The Court remanded the case for further proceedings.

¶8 The Court found that Harris owned the property, but in 1988, she "granted Wensauer a one-half undivided interest in . . . Property." Mary, however, did not record the deeds from Harris. The Court stated:

In 1992, Harris entered into an agreement with Wensauer and Property Management Services, Inc. (PMSI) to sell PMSI all of Harris' right, title and interest in the Property. The Agreement was never filed of record nor were any deeds transferring title from Harris to PMSI. The only documents produced by Wensauer to show PMSI fulfilled its end of the Agreement were two handwritten notes from Harris to PMSI in 2006 requesting the deeds from Harris be filed. From 2002 through 2010, the Oklahoma County Assessor's website listed the owners of the property as "Mykal R. Harris c/o Property Mgmt Services." In May 2003, Harris filed a petition for bankruptcy. On Schedule A of her bankruptcy petition, Harris indicated she held no interest in any real property. In September 2003, Harris' debts were discharged.

(Footnote omitted.)

¶9 Faust claimed its judgment lien was superior to both Harris' and Mary's interests in the Property. The Court explained:

Faust contends 16 O.S. §15 as amended in 1993, modified the definition of "third persons" to include holders of unrecorded interests which would allow judgment liens priority over unfiled deeds. In support of such argument, Faust relied upon a 1997 article from the Oklahoma Bar Journal which cited a 1996 unreported decision from Division 4 of the Oklahoma Court of Civil Appeals.

(Footnote omitted.) Mary, on the other hand, asserted that § 15 "contained nothing suggesting it was intended to overrule 'almost 100 years of jurisprudence' holding that a judgment creditor's lien only attaches to the actual interest of the judgment debtor in the real property." Mary argued the Property's title "was transferred to PMSI and her in 1992 when the terms of the Agreement were fulfilled." She presented "two handwritten letters from Harris dated in 2006 wherein Harris requested the deeds between the parties be recorded." Mary pointed out that the Property was not listed on Harris' bankruptcy petition, and she claimed Faust had notice of PMSI's interest in the Property before it filed its Statement of Judgment.

¶10 The Court in the first appeal offered the following analysis:

The Oklahoma Supreme Court has long recognized that "the grantee in a valid unrecorded conveyance of real estate has a superior claim to that of a judgment creditor claiming under a judgment subsequent to the effective date of the conveyance." Harty v. Hertzler, 1939 OK 211, ¶ 9, 90 P.2d 656, 657. "[T]he reason for the rule is in the fact that the judgment creditor is not a bona fide purchaser as he parts with nothing to acquire his lien." Herndon v. Shawnee Nat'l Bank, 1924 OK 1167, ¶ 2, 232 P. 432, 433.

Title 16 O.S. Supp. 1993 § 15 provides a deed does not have to be acknowledged and recorded in order to be valid as between the parties to the conveyance, but that it is not valid as against third persons unless it has been acknowledged and recorded. The language added to §15 in 1992 provides:

"No judgment lien shall be binding against third persons unless the judgment lienholder has filed his judgment in the office of the county clerk as provided by and in accordance with Section 706 of Title 12 [12-706] of the Oklahoma Statutes."

Contrary to Faust's assertion, nothing in §15 suggests Wensauer/PMSI as the holder of a prior unrecorded deed would be considered a "third person" over whom Faust, the judgment lienholder, would have priority. Section 15 instead protects judgment lienholders who file a statement of judgment as required by 12 O.S. Supp. 1997 §706 against subsequent bona fide purchasers for value. The Oklahoma Supreme Court reiterated the definition of "third persons" in Breeding v. NJH Enter., L.L.C., 1997 OK 65, ¶14, 940 P.2d 502, 505:

We have previously construed a statute that uses the term "third persons." Title 16 [O.S.] 1991 §15 provides that deeds and mortgages "shall not be valid as against third persons unless acknowledged and recorded." We held in Whitehead v. Garrett, 199 Okla. 278, 280, 185 P.2d 686, 688 (1947), "The 'third persons' defined by § 15, supra, refer to innocent purchasers for value."

Further, nothing in §15 alters the nearly 100 years-old Supreme Court precedent in Lunn v. Kellison, 1915 OK 1100, 153 P. 1136: "The judgment lien contemplated by section 5941, Comp. Laws 1909 (Rev. Laws 1910, § 5148)[now 12 O.S. § 706], is a lien only on the actual interest of the judgment debtor, whatever that may be; therefore, though he appear to have an interest, if he has none in fact, no lien can attach." Id. ¶¶ 5-6, 153 P. at 1136 (citations omitted). Neither Wensauer nor PMSI was Faust's judgment debtor. Accordingly, Faust's judgment lien cannot affect their interest in the property if that interest was acquired prior to the filing of Faust's Statement of Judgment.

(Footnote omitted.)

¶11 On remand, Harris testified at trial she first met Brent Wensauer 35 or 40 years ago. She sold over 20 properties to Property Management Services, Inc. (PMSI). When asked about Brent Wensauer's relationship to PMSI, she stated, "As far as I knew he was the company." She testified Mary Wensauer was Brent's mother. PMSI managed properties it owned as well as properties it did not own. Harris contacted Brent in the 1980s to ask if he wanted to invest in a property with her. Brent identified properties in which they could invest. When asked if she was "going to own the property outright," Harris replied, "No. We were halfies." She confirmed the agreement was for her to own half the Property and Brent and PMSI to own the other half. She denied she owned any interest in the Property at the time of trial, when she filed for bankruptcy in 2003, or when there was a judgment entered against her in 2002 by Faust. A warranty deed, dated September 25, 1987, and recorded October 1, 1987, was admitted into evidence that showed a transfer of the interest of John and Eliza Lowe in the Property to Harris. Harris stated she did not know the Lowes and she did not think she understood that the Property "was going to be transferred in total to [her] upon purchase and then [she] would transfer a half interest into PMSI afterwards." A warranty deed dated February 22, 1988, transferred from Harris to Mary Wensauer an undivided one-half interest in Lots 17 and 18 of the Property. A second warranty deed dated that same day transferred from Harris to Mary Wensauer an undivided one-half interest in Lots 19 and 20 of the Property. Although the deeds were notarized, nothing indicates they were recorded. Harris testified she signed the deeds and she had no doubt she was conveying a one-half interest in the Property to Mary. When asked what she thought was the effect of executing the warranty deed, Harris replied, "Mary Wensauer and I held it in total, but in half." She explained, "Well, we owned the property altogether, but half of it was owned by her and half by me." She does not recall a purchase money mortgage being executed for the Property.

¶12 A real estate mortgage dated September 28, 1987, for Lots 17 and 18 and another of the same date for Lots 19 and 20 each granted a mortgage to the Lowes as security for the payment of $30,375. Harris denies making any mortgage payments to the Lowes and she did not know if PMSI ever did so. Although she "put money up front to assist in the purchase of [the Property]," she does not recall how much money she provided.

¶13 A handwritten letter dated September 26, 1991, from Harris to Brent showed Harris provided $10,000 principal to purchase the Property. But as early as 1988, Harris was "asking to be bought out of the project" because she needed the money. After asking more than once, she was finally bought out. Harris signed the document identified as Exhibit 4 titled "Agreement" which lists and describes the lots comprising the Property. It states, "Harris wishes to sell and PMSI wishes to purchase, as nominee, all of Harris' right, title and interest in the Property." The Agreement says PMSI will pay Harris $6,500 in six monthly installments of $1,000 and one installment of $500. In the section titled "Deeds," it states, "If and only if full and final payment of the sum set forth in paragraph 1 hereof is made, PMSI shall record with the Registrar of Deeds for Oklahoma County deeds previously executed (dated February 22, 1988) by Harris for the Property." Harris testified she conveyed all of her interest in the Property to Mary, she had no intention of retaining any interest in the Property, she recalled receiving payment for the Property, and she considered the transaction complete on receiving payment. Harris claimed she asked Brent to record the agreements and conveyances. Although she initially could not recall signing any other deeds or documents, she later recalled signing a quitclaim deed, but she did not retain a copy of it. In 2006, she wrote Brent two letters asking "[t]o be removed from any ownership of the property." She believes PMSI owns the Property.

¶14 On cross-examination, she could not explain why the original deed conveyed the entire Property to her. On redirect, she testified PMSI managed and paid taxes on the Property.

¶15 Brent Wensauer testified he is the president of PMSI and Mary Wensauer was the principal shareholder in PMSI before her death. Mary's estate retains majority ownership in PMSI. The following exchange took place regarding the Property:

Q. . . . . How was it that this [sic] specific properties--duplexes on 23rd, were determined to be the investment property that the two of you would enter into business concerning?

A. Based on the amount of financing that the Lowes were willing to carry as a purchase money mortgage, the amount that she had to invest fit those properties. Would, you know, buy into the equity of those properties and give an operating reserve.

Brent testified Harris had no role in selection of the properties. When asked why the deed conveyed the full interest in the Property to Harris, Brent explained:

Part of it was because she was--this was having to be conveyed back and forth to Florida. And it was being handled--it was closed by State Title Company and it was going to be difficult and unwieldy to try to do it initially, so it was just agreed we'd go ahead and let her step in initially and then we would buy back in our half interest.

¶16 But ultimately, Brent stated, the Agreement provided each would own one-half interest in the Property. PMSI was to manage, maintain, and rent the Property, and pay taxes because Harris was in Florida. At closing, the sellers carried purchase money mortgages. The mortgaged amount for each duplex was $30,375. Brent stated Harris incurred no personal liability for the two mortgages. He did not remember the exact date the mortgages were paid off, but he remembers they were paid off early and were fully satisfied with a final payment in August 2001.

¶17 Brent testified Harris executed a quitclaim deed at the same time they entered into the Agreement to pay Harris for her investment. The quitclaim deed released any interest Harris may have had in the Property. He stated he specified in the Agreement that the quitclaim deed would not be recorded until Harris was paid in full. He explained:

She signed off on it. And the agreement was, you know, I didn't know, you know, if we would have trouble locating her or what her status would be. I wanted to make sure that, you know, we could end, you know, get back, you know, full interest in the property once she'd been paid in the full. So at my request she trusted me enough to go ahead and execute that Quit Claim Deed, but it was clear in the deal that that couldn't be recorded until such time as she had been paid in full.

¶18 Brent testified the quitclaim deed was executed in February 1992, but he could not locate a copy of it. He testified that Harris "kept bugging [him] to get it recorded," but he thought he would "just get her to issue another one." He said that "it didn't affect her interest in [the Property] . . . it was us getting the [P]roperty back." Brent stated, "It never occurred to me that over a decade later some other judgment creditor would come in and claim a property that she'd had nothing [to] do with for a dozen years, which somehow they--they had a right to come in and grab." He detailed that PMSI paid Harris the full amount due pursuant to the Agreement and therefore purchased Harris' remaining interest in the Property. PMSI has exercised exclusive ownership over the Property since 1992. Neither Brent nor PMSI had any further business relationship with Harris since the Agreement was fulfilled. He received paperwork regarding Faust's garnishment and filled it out to indicate Harris was not employed by PMSI and PMSI was not holding any funds for Harris.

¶19 During cross-examination, Brent clarified that the quitclaim deed was not to supersede the two warranty deeds but to memorialize that they had paid Harris according to their Agreement. He claimed the Agreement extinguished Harris' interest in the Property and the quitclaim deed was intended to clean up title to the Property. When asked if he had any documentary evidence that Harris had been paid $6,500 pursuant to the Agreement, he said he had letters admitted into evidence in which Harris asked him to record the deed. He asserted she would not have wanted him to file the quitclaim deed had she not been paid.

¶20 On redirect examination, Brent testified Harris executed four deeds--the two warranty deeds from 1988 and two quitclaim deeds when they made the Agreement to buy Harris out. He could not locate the quitclaim deeds.

¶21 The trial court found that Harris transferred an undivided one-half interest in the Property to Mary by written conveyance executed February 22, 1988. It further found the February 18, 1992, written Agreement regarding Harris' remaining interest in the Property was not effective to transfer her remaining one-half interest in the Property. The court concluded that on August 21, 2001, when Faust filed its statement of judgment in Oklahoma County, the Property was owned by Harris and Mary Wensauer "with each party possessing an undivided one-half interest . . . in fee simple absolute." The trial court held Faust's judgment lien attached only to Harris' one-half interest in the Property.

¶22 Both Linda Holtzclaw, on behalf of Mary's estate, and Harris (collectively, Harris) appeal from the trial court's order as does Faust, arguing that it was error not to find its judgment lien attached to the entire Property, not just an undivided one-half interest.

STANDARD OF REVIEW

¶23 Foreclosure of a lien is a matter of equitable cognizance. See, e.g., First Nat'l Bank of Pauls Valley v. Crudup, 1982 OK 132, ¶ 12, 656 P.2d 914. "In an action of equitable cognizance there is a presumption in favor of the trial court's findings and they will not be set aside unless the trial court abused its discretion or the finding is against the clear weight of the evidence." Smith v. Villareal, 2012 OK 114, ¶ 7, 298 P.3d 533.

ANALYSIS

¶24 The dispositive issues on appeal concern the validity of the 1988 warranty deeds and the 1992 Agreement. Harris asserts the 1988 deeds are valid and the trial court did not err in enforcing those deeds. Harris further asserts that the 1992 Agreement is valid, or in the alternative Harris, at a minimum, transferred all of her equitable interest, right, and title in the Property to PMSI. In its counter-appeal, Faust asserts the trial court erred in concluding that the 1988 deeds transferred from Harris to Mary an undivided one-half interest in the Property, but properly concluded the 1992 Agreement was ineffective to transfer title to PMSI. Faust further asserts, "The trial court's finding that the sheriff's sale did not pass title is contrary to 12 Okla. Stat. § 774."

¶25 We will first examine the 1988 warranty deeds. As the Court of Civil Appeals noted in Case No. 109,056, "Title 16 O.S. Supp. 1993 §15 provides a deed does not have to be acknowledged and recorded in order to be valid as between the parties to the conveyance, but that it is not valid as against third persons unless it has been acknowledged and recorded." Section 15, not amended since 1993, reads:

Except as hereinafter provided, no acknowledgment or recording shall be necessary to the validity of any deed, mortgage, or contract relating to real estate as between the parties thereto; but no deed, mortgage, contract, bond, lease, or other instrument relating to real estate other than a lease for a period not exceeding one (1) year and accompanied by actual possession, shall be valid as against third persons unless acknowledged and recorded as herein provided. No judgment lien shall be binding against third persons unless the judgment lienholder has filed his judgment in the office of the county clerk as provided by and in accordance with Section 706 of Title 12 of the Oklahoma Statutes.

16 O.S.2011 § 15 (emphasis added). For example, in Kaylor v. Kaylor, 1935 OK 530, ¶ 0, 45 P.2d 743 (syl. no. 2 by the Court), the Supreme Court noted: "An unrecorded real or chattel mortgage, or an assignment of interest, to secure a specific advancement or loan of money, is binding between the assignor and assignee, and all persons having actual knowledge of same." The 1988 deeds, although unrecorded, were valid between Harris and Mary Wensauer.

¶26 But Faust did not have notice of the deeds before it filed its lien. The question remains whether Faust is a "third person" within the meaning of § 15 and thus within the class of those entitled to the statute's protection. We conclude it is not.

¶27 The Supreme Court has previously held, "The third person defined by 16 O. S. 1941, § 15 (recordation statute) refers to one who is an innocent purchaser for value, or an incumbrancer, and does not apply to the purchaser at a tax resale or his transferee." Whitehead v. Garrett, 1947 OK 303, ¶ 0, 185 P.2d 686 (syl. no. 5 by the Court). Of more importance to our analysis here, in Oklahoma State Bank of Wapanucka v. Burnett, 1917 OK 338, ¶ 0, 162 P. 1124 (syl. no. 2 by the Court), the Court held, "The 'third person' defined by [the recordation statute] refers to one who is an innocent purchaser for value, or an incumbrancer, and does not in any manner apply to a judgment creditor with a lien." In Whitehead, the Court concluded, "Owner of fee simple title by virtue of unrecorded deed from record owner can maintain action to defeat resale tax deed as a cloud on his title." Whitehead, 1947 OK 303, ¶ 0 (syl. no. 3 by the Court). In J. I. Case Threshing Machine Co. v. Walton Trust Co., 1913 OK 658, ¶ 0, 136 P. 769 (syl. no. 6 by the Court), the Supreme Court tells us: "The judgment lien contemplated by section 5941, Comp. Laws 1909 (Rev. Laws 1910, sec. 5148), is a lien only on the actual interest of the judgment debtor, whatever that may be; therefore, though he appear to have an interest, if he has none in fact, no lien can attach." Section 5148 provided in relevant part: "Judgments of courts of record of this State, except county courts, and courts of the United States rendered within this State, shall be liens on the real estate of the debtor within the county in which the judgment is rendered . . . ." Revised Laws of Oklahoma 1910, section 5148.

¶28 The Walton Court offered the following explanation for the distinction between a judgment creditor and a bona fide purchaser:

It may be asserted as a rule very generally recognized that a judgment creditor is not a bona fide purchaser. He parts with nothing to acquire his lien. He is in a very different position from one who has bought and paid, or who has loaned, on the face of the recorded title. The equities are entirely unlike, as one has, and the other has not, parted with value relying upon the record. If the real avails over the apparent title, the one is no worse off than before he acquired his lien--has lost nothing; while the other has lost the value paid or loaned. Hence equity will help the latter, while it cares nothing about the former.

Walton, 1913 OK 658, ¶ 3.

¶29 At issue in Lunn v. Kellison, 1915 OK 1100, ¶ 4, 153 P. 1136, was:

whether the judgment lien was superior to the title of the purchasers of said lots who had bought same from defendant in execution prior to the rendition of said judgment, upon which said execution was issued, but whose deeds had not been filed for record in the office of the register of deeds of said county prior to the levy of said execution upon said lots.

The Lunn Court quoted "Gilbreath v. Smith, 50 Okla. 42, 150 P. 719," for this statement of law: "'The lien of a judgment attaches only to the interest in real estate owned by the judgment defendant; and judgment creditors are not bona fide purchasers. Such creditors part with nothing to acquire the lien.'" Lunn, 1915 OK 1100, ¶ 5.

¶30 We conclude, as the trial court did, that the warranty deeds of February 22, 1988, conveyed from Harris to Mary an undivided one-half interest in the Property although not recorded.

¶31 But we depart from the trial court's ruling regarding the 1992 Agreement between Harris and PMSI and hold the completion of payment under the Agreement established title in PMSI. Harris and Brent both testified payments were completed as contemplated by the Agreement. Introduced at trial were two receipts for cashier's checks, one for $1,000 dated April 2, 1992, payable to Harris, and a second one for $1,000 dated May 4, 1992, also payable to Harris. Documentary evidence admitted at trial showed partial payment, and Brent and Harris testified that PMSI and Brent paid Harris the total amount due. Brent and Harris both testified that Harris executed a quitclaim deed. A letter admitted into evidence dated September 21, 2006, from Harris to Brent stated, "Please file the Quit Claim deed on 23rd you've had in my name for 12 years." A second letter admitted into evidence from Harris to PMSI dated October 23, 2006, stated, "Please file the Quit Claim deed that I gave you under nickname 'Mykal Harris' over 15 years ago on the duplex located at 2824 & 26 NW 23rd St. OKC, OK." Evidence at trial showed two real estate mortgages executed on the Property to the Lowes as security for the payment of $30,375 and Harris stated she never made any mortgage payments to the Lowes. Brent testified Harris incurred no personal liability for the two mortgages. He also testified that, although he did not remember the exact date the mortgages were paid off, he remembers they were paid off early and were fully satisfied with a final payment in August 2001. A copy of a PMSI check dated August 3, 2001, shows a payment of $8,388 and a notation that the check represented payment in full for the notes and mortgage for 2824-26 NW 23rd, 2826-30 NW 23rd, and a third property. Tax returns for Mary and Donald Wensauer for 1992, 1993, 1994, 1995, and 1996 listed 2824-26 & 2828-1/2 NW 23rd on Schedule E, Supplemental Income and Loss. Harris did not include the Property as an asset when she filed bankruptcy in 2003. These facts clearly show that the Agreement was completed and Harris no longer had any interest in the Property.

¶32 In Adams v. White, 1913 OK 609, ¶ 1, 139 P. 514, the Court explained:

It has also been held that the possession of real property carries with it the presumption of ownership, and it is the duty of those purchasing such property from others than those in possession to ascertain the extent of their claims, and the open, actual possession of such property gives notice to the world of just such interest as the possessor actually has therein. Russell v. Gerlach, 24 Okla. 556, 103 P. 604; Cooper v. Flesner, 24 Okla. 47, 103 P. 1016, 23 L. R. A. (N. S.) 1180, 20 Ann. Cas. 29; Edwards v. Montgomery, 26 Okla. 862, 110 P. 779. Having reached the conclusion that the oral contract of sale is not invalid under the statute of frauds, the case of Hampson v. Edelen, 2 Har. & J. (Md.) 64, 3 Am. Dec. 531, seems to be in point. Mr. Chief Justice Chase, speaking for the court, says: "In this case it appears that a considerable part of the purchase money was paid, and possession given of the land, prior to the obtention of the judgments by Hampson against Wade. A contract for land, bona fide, made for a valuable consideration, vests the equitable interest in the vendee from the time of the execution of the contract, although the money is not paid at that time. When the money is paid, according to the terms of the contract, the vendee is entitled to a conveyance, and to a decree in chancery for a specific execution of the contract, if such conveyance is refused. A judgment obtained by a third person against the vendor, mesne the making the contract and the payment of the money, cannot defeat or impair the equitable interest thus acquired, nor is it a lien on the land to affect the right of such cestui que trust. A judgment is a lien on the land of the debtor, and attaches on it as a fund for its payment; but the legal estate in the land is not vested in the judgment creditor, although he can convert it into money, to satisfy his debt, by pursuing the proper means."

(Emphasis added.) As we explain below, even if the Agreement were simply a contract for the sale of Harris' interest in the Property, this transfers at least equitable title.

¶33 Similarly, in City Guaranty Bank of Hobart v. Boxley, 1928 OK 448, ¶ 0, 270 P. 69 (syl. no. 1 by the Court), the Court instructed:

A bona fide contract, made for a valuable consideration for the sale of real estate, vests the equitable interest in the vendee from the time of the execution of the contract, and the vendee is entitled to a conveyance, and to a decree in chancery for specific performance of the contract, if such conveyance is refused; and a judgment obtained by a third person against the vendor subsequent to the making of such contract, but prior to the time of its complete performance, cannot defeat or impair the equitable interest thus acquired, nor is it a lien on the land to affect the right of such cestui que trust.

(Emphasis added.) The Court concluded, "A judgment lien does not reach the mere legal title of property in the debtor, when the equitable title is in another. Open, actual, and peaceful possession of real estate gives notice to the world of just such interest as the possessor actually has therein." Id. (syls. no. 2-3 by the Court) (emphasis added).

¶34 Even without full payment by PMSI, pursuant to Oklahoma law, PMSI clearly had at least equitable title to the Property. In First Mustang State Bank v. Garland Bloodworth, Inc., 1991 OK 65, ¶ 10, 825 P.2d 254, the Supreme Court explained the doctrine of equitable conversion: "The doctrine of equitable conversion, long recognized by Oklahoma, 'is a fiction resting upon the fundamental rule of equity that equity regards that as done which ought to be done.'" Id. (quoting First Sec. Bank v. Rogers, 429 P.2d 386, 389 (Idaho 1967)). "Under the doctrine, an equitable conversion may take place when a contract for sale becomes binding on the contracting parties." Id. "The theoretical basis for the doctrine is founded on the concept that at the time the contract for sale is entered into by the parties, the purchaser becomes the true owner of the realty, with the seller retaining the right to possession and legal title as security for the payment price." Id. The Court further clarified the doctrine:

The doctrine of equitable conversion divides the "bundle" of property rights between the seller and the purchaser. The purchaser is regarded as the owner and generally has the right to possession of the realty. The seller's position is analogous to that of the mortgagee who retains legal title as security for the purchase price. In other words, the buyer's interest is converted to realty and the seller's interest is converted to personalty.

Id. ¶ 11 (citations omitted). The Court stated that the purchaser does not obtain the right to obtain legal title until he or she has complied with the obligation to pay. Id. ¶ 12. "Until the purchaser has paid the full amount of the contract price, the seller continues to have a real property interest in the land." Id. ¶ 13. "This interest is not only mortgagable to third parties, but is also subject to other liens." Id. The Court stated, "These third-party mortgagees and creditors have a valid claim to the realty, subject to the prior claim of the purchaser." Id. "The claims of third-party creditors extend to the seller's remaining interest in the land and operates to bind the land to the extent of the unpaid purchase price." Id.

¶35 The clear weight of the evidence establishes PMSI paid Harris the full purchase price. Faust's judgment lien "is a lien only on the actual interests of the judgment debtor, whatever they may be. Therefore, though he appear to have an interest, if he has none in fact, no lien can attach." Oklahoma State Bank of Wapanucka v. Burnett, 1917 OK 338, ¶ 0, 162 P. 1124 (syl. no. 1 by the Court). Although Harris may have appeared to have an interest in the Property, the Agreement and payment of the agreed price extinguished any interest she may have had and the judgment lien could not attach to the Property. The record shows that either PMSI/Brent or Mary paid the mortgages on the Property and re-paid Harris for her initial $10,000 investment. There is nothing nefarious about PMSI's or Brent's failure to file the quitclaim deeds that both Brent and Harris testified Harris executed. To allow Faust to foreclose a lien on property in which Harris has no remaining interest and for which PMSI/Brent and/or Mary paid would be iniquitous.

¶36 In its counter-appeal, Faust asserts 12 O.S.2011 § 774 mandates that the order confirming the sheriff's sale should be left undisturbed. Section 774 states:

If any judgment or judgments, in satisfaction of which any lands or tenements are sold, shall at any time thereafter be reversed, such reversal shall not defeat or affect the title of the purchaser or purchasers; but in such cases, restitution shall be made, by the judgment creditors, of the money, for which such lands or tenements were sold, with lawful interest from the day of sale.

12 O.S.2011 § 774. However, Oklahoma case law has specifically found § 774 does not apply in situations like this:

[Section 774] which provides that "if any judgment or judgments, in satisfaction of which any lands or tenements are sold, shall at any time thereafter be reversed, such reversal shall not defeat or affect the title of the purchaser or purchasers," has no application to a case where the judgment creditor purchases the land at the sheriff's sale, nor to the grantee of such purchaser. Nor does said section apply when the judgment and sale based thereon are void on their face.

Morgan v. City of Ardmore ex rel. Love & Thurmond, 1938 OK 227, ¶ 0, 78 P.2d 785 (syl. no. 4 by the Court) overruled on other grounds in part by City of Bristow ex rel. Hedges v. Groom, 1944 OK 223, 151 P.2d 936.

¶37 Because Harris had no interest in the Property when Faust filed its judgment lien, Harris had no interest to which the lien could attach. We reverse the decision of the trial court finding that only one-half of Intervenor Holtzclaw's interest is unaffected by the lien and hold that none of Intervenor Holtzclaw's interest is affected by or subject to the judgment lien.

CONCLUSION

¶38 We affirm the trial court's decision that the 1988 warranty deeds transferred an undivided one-half interest in the Property to Mary Wensauer. But we conclude the trial court's decision regarding the 1992 Agreement was against the clear weight of the evidence and contrary to law--subsequent completion of the 1992 Agreement's terms and the execution of quitclaim deeds, although unrecorded, resulted in transfer of title to PMSI. Because Harris had no interest in the Property when Faust filed its judgment lien, application of the lien to the Property and foreclosure of the lien were improper, requiring reversal with directions on remand to enter judgment in favor of Harris and Holtzclaw in conformity with this Opinion.

¶39 AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH DIRECTIONS.

BARNES, P.J., and RAPP, J., concur.

FOOTNOTES

[1] Linda Holtzclaw, as Special Administrator of the Estate of Mary E. Wensauer, was substituted as a party in this lawsuit after Mary Wensauer's death.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1939 OK 211, 90 P.2d 656, 185 Okla. 151, HARRY v. HERTZLER
Discussed
 1913 OK 609, 139 P. 514, 40 Okla. 535, ADAMS v. WHITE
Discussed
 1913 OK 658, 136 P. 769, 39 Okla. 748, J. I. CASE THRESHING MACH. CO. v. WALTON TRUST CO.
Discussed at Length
 1991 OK 65, 825 P.2d 254, 62 OBJ 2087, First Mustang State Bank v. Garland Bloodworth, Inc.
Discussed
 1938 OK 227, 78 P.2d 785, 182 Okla. 542, MORGAN v. CITY OF ARDMORE ex rel. LOVE & THURMOND
Discussed
 1947 OK 303, 185 P.2d 686, 199 Okla. 278, WHITEHEAD v. GARRETT
Discussed at Length
 1915 OK 1100, 153 P. 1136, 66 Okla. 168, LUNN v. KELLISON et al.
Discussed at Length
 1997 OK 65, 940 P.2d 502, 68 OBJ 1767, Breeding v. NJH Enterprises, LLC
Discussed
 1917 OK 338, 162 P. 1124, 65 Okla. 74, OKLAHOMA STATE BANK OF WAPANUCKA v. BURNETT et al.
Discussed at Length
 1935 OK 530, 45 P.2d 743, 172 Okla. 535, KAYLOR v. KAYLOR
Discussed
 1909 OK 137, 103 P. 1016, 24 Okla. 47, COOPER v. FLESNER
Discussed
 1909 OK 192, 103 P. 604, 24 Okla. 556, RUSSELL v. GERLACH
Discussed
 1910 OK 208, 110 P. 779, 26 Okla. 862, EDWARDS v. MONTGOMERY
Discussed
 1924 OK 1167, 232 P. 432, 105 Okla. 207, HERNDON v. SHAWNEE NAT. BANK
Discussed
 2012 OK 114, 298 P.3d 533, SMITH v. VILLAREAL
Discussed
 1928 OK 448, 270 P. 69, 132 Okla. 183, CITY GUAR. BANK OF HOBART v. BOXLEY
Discussed
 1982 OK 132, 656 P.2d 914, First Nat. Bank of Pauls Valley v. Crudup
Discussed
 1944 OK 223, 151 P.2d 936, 194 Okla. 384, CITY OF BRISTOW ex rel. HEDGES v. GROOM
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 706, Judgments as Liens - Filing - Execution
Discussed at Length
 12 O.S. 774, Judgment to Be Reversed at Any Time
Discussed
Title 16. Conveyances
 Cite
Name
Level

 16 O.S. 15, Necessity of Acknowledgment and Recording as to Validity - Acknowledge and Record as Condition for Judgment Lien to be Binding against Third Persons
Discussed at Length


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA